IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

CHESTER RAY SLAUGHTER,

Defendant.

CRIMINAL ACTION FILE
NO.  4:10-CR-24-HLM-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Chester Ray Slaughter's Motion
to Suppress Statement [10] and Motion to Suppress Illegally Seized Evidence [11].
On August 30, 2010, the Court conducted an evidentiary hearing [15] regarding the
instant Motions, which has been transcribed [16].   The Court reopened the
suppression hearing at defendant's request [17] and permitted the introduction of
additional evidence and witnesses at a second hearing on November 29, 2010 [21],
which also has been transcribed [22].[1]  The parties have briefed the matter.  (See
Mem. Supp. Mots. Supp. [24] ("Def.'s Br."); Gov't Resp. [25]; Def.'s Reply [26].)

_____

[1] The undersigned refers to the August 30, 2010 hearing transcript as "I Tr."
and the November 29, 2010 hearing transcript as "II Tr."

AO 72A
(Rev.8/8
2)

On the basis of the testimony and evidence produced at those hearings, the undersigned **REPORTS** that law enforcement had probable cause to arrest Mr. Slaughter for attempted enticement of a minor, but that their warrantless entry into his motel room violated the Fourth Amendment and tainted his consent to search the room and his vehicle. However, Mr. Slaughter's later videotaped statement is admissible, as police provided him with a Miranda warning and he in turn voluntarily and knowingly waived those rights. Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statement [10] be **DENIED**, and his Motion to Suppress Illegally Seized Evidence [11] be **GRANTED IN PART**.

I.    **STATEMENT OF FACTS**

A.    **Investigation And Arrest Of Defendant**

An unknown individual responded to a Craig's List Causal Encounters listing, purportedly posted by two girls ages fourteen and fifteen, seeking someone to buy them beer. (I Tr. 30-31, 33, 36-37, 39.)[2] This individual then engaged in Internet and telephone communication with undercover law enforcement officers, who had

_____

[2] Before entering the Casual Encounters listings, users are warned that the page is intended for persons eighteen years old and older. (I Tr. 31-32.)

AO 72A
(Rev.8/8
2)

posted the request.  (Id. at 32-33.)  Those conversations culminated in this individual

agreeing to rent a motel room in order to meet with the "girls" and to bring beer and

condoms with him.  (Id. at 6, 39.)[3]  They all agreed to rendezvous at a Hardee's

parking lot before going to the motel room.  (Id.)

On May 7, 2010, however, this individual spoke with the undercover officer

posing as one of the girls via telephone and informed her that he was in the motel

room.  (I Tr. 6, 33, 46.)  This individual requested that the "girls" meet him at Room

210 of the Super 8 Motel in Ringgold, Georgia.  (Id. at  6-7, 38.)  Five or six law

enforcement officers, including Detective Sergeant David Lee Scroggins of the

Rossville Police Department, Special Agent ("SA") Hillman with the Federal Bureau

of Investigation ("FBI"), and Detective Barry Woods of the Dalton Police

Department, then traveled to Room 210 to arrest its occupant.[4]  (Id. at 4-6, 10.)[5]

------

[3] During the communications at issue, the individual agreed to bring condoms
to the meeting after the "girls" told him, "We don't want to get pregnant."  (I Tr. 39.)

[4] Because the officers had not yet identified the target of their investigation,
they did not have an arrest warrant.  (Gov't Resp. 10 n.4; I Tr. 35.)  Likewise, they
did not have search warrant for Room 210 or for the automobile driven by the
room's occupant.  (I Tr. 35.)

[5] Detective Scroggins is assigned to the Northwest Georgia Task Force of the
Innocent Images National Initiative.  (I Tr. 4.)  The Task Force investigates Internet
crimes and other crimes against children, including investigating individuals who

AO 72A
(Rev.8/8
2)

At approximately 5:19 p.m., the officers arrived at the Super 8 Motel in Ringgold, stood outside Room 210 with their backs against the wall, and knocked on the door.  (I Tr. 7, 34; II Tr. 16; Def.'s Ex. 3 (chronological time-stamped photos documenting arrest and search).)  The officers had their weapons drawn and were wearing bulletproof raid vests emblazoned with the words "Police" or "FBI" and badge patches.  (I Tr. 8, 35.)  When Room 210's occupant opened the door, SA Hillman stated, "We're here to take you into custody for responding to meet with children."  (Id. at 7-8, 32-33; see also id. at 34-35.)  The officers immediately stepped into the motel room (without the occupant's permission), took him to the floor, and handcuffed him behind his back.  (Id. at 9-10, 34-35, 42.)  SA Hillman then told the person he just arrested that the officers did not want to embarrass him or to publicize his arrest, but preferred that he cooperate with them.  (Id. at 29-30, 34, 46-47.)[6]

---

attempt to meet with, or collect pornographic images of, children over the computer. (Id.)

[6] At some point early in this citizen-police encounter, officers learned that the person they had arrested was Mr. Slaughter.

4

**B.      Search Of Room 210 And Defendant's Vehicle**

After searching Mr. Slaughter and the immediate area within his reach for weapons, the officers permitted defendant to stand up and move around.  (I Tr. 10-11, 15-16, 41-42.)  Detectives Scroggins and Woods did not Mirandize defendant at that time, but did ask Mr. Slaughter for consent to search Room 210 and his vehicle (which he had driven to the motel).  (Id. at 10-11, 36, 40.)  According to Detective Scroggins, no threats or promises were made to defendant in an attempt to obtain his consent.  (Id. at 11-12.)  Additionally, defendant appeared alert and sober, and understood the questions asked of him.  (Id.)

The detectives presented Mr. Slaughter with a form the size of a business card titled, "Consent Search Warning," and announced that they sought permission to search Room 210 of the Super 8 Motel and defendant's vehicle.  (I Tr. 11-13; Gov't Ex. 1.)  Detective Woods read the contents of the card to Mr. Slaughter, including the warnings that he had the right to refuse their request to search his vehicle and the motel room, and that anything found during those searches could be used against him.  (I Tr. 13-14.)  Detective Woods then asked defendant, "Do you understand each of the rights that I've explained to you?"  (Id. at 14.)  Mr. Slaughter acknowledged the above rights and stated that he understood them.  (Id. at 14, 16.)

5

However, neither defendant nor Detective Woods wrote anything on the portion of the card which sets forth the same question.  (Gov't Ex. 1; see also I Tr. 40.) Likewise, defendant and Detective Woods failed to complete the portion of the card which states, "Understanding these rights, are you willing to allow me to search your–."  (Gov't Ex. 1; see also I Tr. 40-41.)

At 5:27 p.m., defendant and Detective Woods both signed the form.  (I Tr. 14-15, 23; Gov't Ex. 1 (date and time documented below signature line).)  Mr. Slaughter was not wearing his glasses and was handcuffed in the front.  (I Tr. 41.)  Based on time and date stamped photographs taken during defendant's arrest and the subsequent search, officers began searching Room 210 and closed containers therein (refrigerator and plastic bag) before he signed the search consent form.  (Compare I Tr. 15, with II Tr. 4-6, 11-22 (discussing picture taken at 5:20 p.m. showing contents of refrigerator).)[7]  There were, however, items in plain view that the officers observed while in the room.  (I. Tr. 15, 36-37.)

------

[7] The Government has agreed not to admit evidence found in closed containers in Room 210 (Gov't Ex. 2, Items 1-4 & 6-7) and related testimony at trial.  (Gov't Resp. 15 n.6.)  However, the Government seeks to admit items found in plain view and in defendant's vehicle (searched after he gave consent).  (Id.)

6

Mr. Slaughter neither requested an attorney nor asked the officers to stop or limit their search of Room 210 or his vehicle.  (I Tr. 16-17.)[8]  After those searches, police transported Mr. Slaughter to the Catoosa County Sheriff's Office.  (Id. at 19-20.)

### C.   **Defendant's Custodial Statement**

At 6:00 p.m. on May 7, 2010, Detective Scroggins met with Mr. Slaughter in an administrative room at the Catoosa County Sheriff's Office.  (I Tr. 19-20, 26.)[9] Before Mirandizing defendant, Detective Scroggins made the following statement:

> When we were at the hotel, Agent Hillman told you that we're not here to embarrass you or to make this stuff public information.  In fact that's the furtherest [sic] thing from our desires.  Okay.  And uh, I'm just going to be absolutely honest with you, it's not because we care a whole lot about Chester.  It's because we don't want it to get in the way of us catching the next one.  Okay.  And we don't want it on the media and we don't want it in the news and we don't  . . . the fewer people who know about this for us the better.  In that vein, we hope you will

---

[8] Detective Scroggins testified that defendant observed the search of his automobile from a police transport vehicle.  (I Tr. 17-18, 42-43.)  Officers found an envelop containing assorted papers in defendant's car.  (Id. at 19.)

[9] Before the interview, Detective Scroggins prepared a Miranda waiver form for defendant.  (I Tr. 20-23, 26.)  Per Mr. Slaughter's responses, Detective Scroggins noted on the form that he graduated from high school after completing the twelfth grade, and reads and writes well.  (Id. at 23-24, 26-27; Gov't Ex. 3 (Miranda waiver form).)

AO 72A
(Rev.8/8
2)

be cooperative with us and you have been so far and I expect you will
continue to be.

(Gov't Ex. 4 (videotaped interview), at 5:52-6:35; see also I Tr. 29-30.)[10]

Detective Scroggins unhandcuffed Mr. Slaughter and read the Miranda form
to him, explaining each right.  (I Tr. 20-22, 26-27, 40.)  Mr. Slaughter asked for his
eye glasses, and read and signed the form; he did not ask any questions of Detective
Scroggins, state that he did not understand the form or Detective Scroggins's
explanation, ask to speak with an attorney, or ask to stop the interview.  (Id. at 22-23,
27-29; Gov't Exs. 3 & 4.)  SA Hillman signed the form as a witness that those rights
were reviewed with Mr. Slaughter.  (I Tr. 23, 28.)

Detective Scroggins and SA Hillman interviewed defendant for approximately
one hour; defendant did not seek to end the interview earlier.  (I Tr. 20, 28.)  Mr.
Slaughter remained unrestrained during the custodial interview.  (Id. at 20, 27.)
Additionally, no threats or promises were made to Mr. Slaughter before he signed
the Miranda waiver form, and he had access to a rest room and water during the
interview.  (Id. at 20, 22, 28.)

_____

[10]  The officer's videotaped defendant's Miranda waiver and interview;
portions of that recording were played during the August 30, 2010 hearing.  (See I
Tr. 24, 26-30; Gov't Ex. 4.)

8

## II.   **THE CHARGING DOCUMENT**

On June 1, 2010, the grand jury returned a two-count Indictment against Mr. Slaughter concerning conduct allegedly occurring in this District.  Count One alleges that, beginning on April 28, 2010, and continuing until May 7, 2010, Mr. Slaughter used a computer connected to the Internet to attempt to entice an individual younger than eighteen to engage in sexual activity in violation of O.C.G.A. § 16-6-4 and 18 U.S.C. § 2422(b).  (Indictment Count One.)  Count Two charges that, during the same time period, defendant was required by Federal or other law to register as a sex offender and committed a felony offense involving a minor in violation of 18 U.S.C. § 2422, thereby also violating 18 U.S.C. § 2260A.  (Indictment Count Two.)

## III.   **CONTENTIONS OF THE PARTIES**

Mr. Slaughter argues that his May 7, 2010 warrantless arrest was unlawful and seeks to exclude both the evidence seized as a result of that arrest and his custodial statement.  (See generally Def.'s Br.)  Defendant argues that the Government lacked probable cause to arrest him for the alleged crime, and unlawfully entered his motel room to do so.  (Id. at 7-13.)  He further contends that those events tainted his subsequent consent to search the motel room, requiring suppression of all evidence

found therein.[11]   (Id. at 13-16.)   Likewise, Mr. Slaughter seeks to suppress his identity and prior conviction, as fruit of the alleged unlawful arrest. (Id. at 7 n.5, 14.) Finally, Mr. Slaughter argues that his May 7, 2010 custodial statement is a fruit of that illegal arrest and therefore must be excluded.   Alternatively, he contends that his statement was coerced and involuntary.  (Id. at 17-18.)

The Government responds that defendant's arrest was supported by probable cause, but admits that warrantless entry into Room 210 required exigent circumstances.   (Gov't Br. 7-10.)   Thus, the Government argues that if police delayed Mr. Slaughter's arrest in order to obtain a warrant, he likely would have destroyed critical evidence–his cell phone.  (Id. at 12.)   The Government also contends that Mr. Slaughter's consent to the searches and his custodial statement were voluntary, rendering the resulting evidence admissible. (Id. at 13-23.) Finally, the Government argues that United States v. Farias-Gonzalez, 556 F.3d 1181 (11th

---

[11] It appears that officers began searching Mr. Slaughter's hotel room and closed containers therein (refrigerator and plastic bag) before Mr. Slaughter signed the search consent form. (Compare I Tr. 15, with II Tr. 11-22; Gov't Resp. 15 n.6.) Thus, the Government has agreed not to admit that evidence or related testimony at trial. (Id.) However, the Government seeks to admit items found in plain view and in defendant's vehicle (searched after he gave consent).  (Id.)

AO 72A
(Rev.8/8
2)

Cir. 2009), clearly forecloses Mr. Slaughter's request to suppress any identity-related evidence, including his prior conviction.  (Id. at 23-24.)

**IV.   ANALYSIS**

 **A. Probable Cause To Arrest**

 Probable cause to arrest without a warrant exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  Here, defendant is charged with, inter alia, attempting to sexual exploit a minor in violation of 18 U.S.C. § 2422(b).  Section 2422(b) provides that,

> [w]hoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than ten years or for life.

18 U.S.C. § 2422(b) (emphasis added).  Additionally, the crime of attempt requires both (1) specific intent to commit the crime, and (2) an objective action that constitutes a substantial step toward commission of that crime.  United States v.

<u>Yost</u>, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam); <u>United States v. Root</u>, 296 F.3d 1222, 1227-28 (11th Cir. 2002).

Eleventh Circuit law clearly establishes that communicating with a fictitious minor regarding sex and arranging to meet her for sex satisfies the intent element of an attempt in violation of § 2422(b).  <u>United States v. Rothenberg</u>, 610 F.3d 621, 626 (11th Cir. 2010) (fictitious minor sufficient to prove attempted exploitation if defendant believed minor was involved); <u>see also</u> <u>Yost</u>, 479 F.3d at 819. Additionally, in <u>Yost</u>, the Eleventh Circuit found that the second element–a substantial step–was satisfied where the defendant engaged in sexually explicit communications with the alleged minors, called one alleged minor on the telephone and arranged to meet her for sex (although he failed to show up), and made arrangements to meet the other minor for sex and arrived at that set time and place. 479 F.3d at 819-20.

Testimony presented at the August 30, 2010 hearing reveals that Mr. Slaughter engaged in communications and actions similar to those discussed in <u>Yost</u>, evidencing both his specific intent and substantial steps to entice minors to engage in criminal sexual activity.  With regard to the first element, Mr. Slaughter initiated contact with undercover officers after reading a Craig's list post submitted by two

AO 72A
(Rev.8/8
2)

girls, ages fourteen and fifteen.  (I Tr. 30-39.)  Internet and telephone communications culminated in defendant renting a motel room and arranging to meet the girls.  (<u>Id.</u> at 6, 32-33.)  Moreover, when the girls expressed concern that they did not want to become pregnant as a result of meeting defendant, he agreed to bring condoms.  (<u>Id.</u> at 6, 39.)  Those communications, directly from defendant, evidence his intent to entice the minors to have sexual intercourse with him.  With regard to the second element, Mr. Slaughter's act of arranging to meet minors to engage in sexual activity, renting a motel room for that purpose, calling the girls (who were actually undercover officers) and telling them to come to a specific motel and room where he was, taken as a whole, corroborate his intent and constitute substantial steps to engage in criminal activity.

Therefore, the officers had knowledge that would lead a reasonably cautious person to believe that defendant attempted to entice minors to engage in criminal sexual activity.  Accordingly, the officers had probable cause to arrest defendant for violating 18 U.S.C. § 2422(b).

13

AO 72A
(Rev.8/8
2)

### B.   The Warrantless Arrest In Room 210

It is well settled, however, that "probable cause [to arrest] alone is insufficient" to permit warrantless entry into a residence–including a motel room. McClish v. Nugent, 483 F.3d 1231, 1238 (11th Cir. 2007) (citing Payton v. New York, 445 U.S. 573, 589-90 (1980)); United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994) ("Use of a motel room for lodging provides the same expectation of privacy as does a home."). Such entry is permissible if the occupant consents, or if exigent circumstances, such as the destruction of evidence, necessitate immediate action. McClish, 483 F.3d at 1240-41. Additionally, an officer conducting a warrantless search or seizure inside a home bears the burden of proving his conduct was justified. Id. at 1241. Therefore, the Court examines the circumstances under which officers crossed the threshold into Mr. Slaughter's motel room.

The undisputed evidence shows that, after defendant told the undercover officer that he was in Room 210 of the Super 8 Motel, the officers arrived at that location, stood outside Room 210 with their backs against the wall, and knocked on the door. When Mr. Slaughter opened the door, the officers immediately stepped into the motel room and placed defendant in handcuffs. (I Tr. 7-10, 34-35, 42.) Thus, there is no dispute that Mr. Slaughter did not give the officers permission to

14

enter Room 210.  Rather, the Government argues that exigent circumstances required warrantless entry into the motel room.

"The exigent circumstances exception to the warrant requirement is based on the understanding that in some situations, 'a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant.'" Bates v. Harvey, 518 F.3d 1233, 1245 (11th Cir. 2008) (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978)).  When determining whether warrantless entry to effect an arrest is permissible, the Eleventh Circuit directs District Courts to consider the following factors:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public.

United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987) (per curiam); see also Parker v. Allen, 565 F.3d 1258, 1289-90 (11th Cir. 2009) (applying factors in context of federal habeas case).

However, "[i]t is well settled that '[c]ircumstances are not normally exigent where the suspect[] [is] unaware of police surveillance.'" United States v. Santa, 236

15

F.3d 662, 669-70 (11th Cir. 2000) (quoting <u>United States v. Tobin</u>, 923 F.2d 1506,

1511 (11th Cir. 1991)).  "Mere speculation about [a suspect's] suspicions,

without factual support, is not enough to overcome the warrant requirement." <u>Id.</u> at

671; <u>but see</u> <u>id.</u> at 670 (noting that "some courts have held that where the evidence

supports an inference that the suspects expect to meet or contact their co-conspirators

before police can obtain a warrant, it is reasonable for police to assume that the

suspects' suspicions create a substantial risk justifying a warrantless entry").

Moreover, "[t]he test of whether exigent circumstances exist is an objective one,"

and police may not create exigent circumstances in lieu of obtaining a warrant. <u>Id.</u>

at 669-70.

The Government contends that warrantless entry to arrest defendant was

appropriate because his ultimate objective was to commit a violent crime, he was in

a definite location, and any delay would have allowed him to flee and/or destroy

evidence of the crime.  (Gov't Resp. 12.)  Although enticement of a minor violates

§ 2422(b), there was no indication that defendant was armed or that delaying his

apprehension posed a danger to the officers or the public.  Indeed, the undercover

agents were posing as the "girls" defendant intended to meet, so there was no threat

of immediate harm to a minor at that time.  Moreover, given defendant's definite

16

location, the officers could have maintained surveillance of Room 210 while obtaining (even via telephone) a search warrant for "the person" of the suspect in Room 210.   If defendant had emerged from Room 210 before a warrant was obtained, the officers could have effectuated a valid public arrest.

Additionally, the record evidence does not support the Government's argument that warrantless entry was necessary to prevent the destruction of evidence. The record evidence does not indicate how soon Mr. Slaughter expected the "girls" to arrive at Room 210 after he relayed his location in a telephone call with the undercover agent.   Likewise, there is no evidence that Mr. Slaughter had become aware that he was under police investigation or suspected the "girls" were not going to arrive.   Unaware of an impending arrest, Mr. Slaughter had no reason to flee or to destroy evidence in Room 210.   Furthermore, there is no evidence in the record indicating that the officers seized the motel room to prevent the destruction of evidence until a search warrant could be obtained.   Rather, Detective Scroggins testified that the officers' purpose in entering Room 210 was to arrest Mr. Slaughter.

For the reasons set forth above, the Government has failed to prove that exigent circumstances justified warrantless entry into the motel room; therefore, that entry and Mr. Slaughter's arrest were illegal.   However, it is well established that a

search pursuant to valid consent is an exception to the Fourth Amendment's warrant requirement. <u>Santa</u>, 236 F.3d at 676.   Accordingly, the Court must examine the circumstances surrounding Mr. Slaughter's subsequent written consent to search Room 210 in order to determine whether the fruit of that illegal entry is admissible.

### C.    <u>Post-Arrest Consent To Search The Room And Vehicle</u>

To be valid, consent to search given after an illegal seizure must (1) be voluntary and (2) may not be the product of the illegal detention.  <u>Santa</u>, 236 F.3d at 676.  The first prong of the consent analysis focuses on whether consent was the product of the defendant's free will and is determined by the totality of the circumstances.  <u>Brown v. Illinois</u>, 422 U.S. 590, 601-02 (1975); <u>United States v. Purcell</u>, 236 F.3d 1274, 1281 (11th Cir. 2001).   The second prong focuses on causation–determining whether consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  <u>Wong Sun v. United States</u>, 371 U.S. 471, 486 (1963) (explaining that not all evidence resulting from illegal police action is poisoned fruit, but that appropriate question is whether evidence was obtained by exploiting the illegal action).  The following factors are relevant to the causation determination: (1) the temporal proximity of the arrest and the consent to the search,

18

(2) intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.  Santa, 236 F.3d at 677.

Even assuming Mr. Slaughter voluntarily consented to the search (the first prong above), the evidence obtained from Room 210 and his vehicle must be excluded as the product of his illegal detention (the second prong–causation).  With regard to the first causation factor, Mr. Slaughter signed the consent form at 5:27 p.m., less than ten minutes after police illegally entered Room 210 and arrested him at 5:19 p.m.  The second factor also counsels against admitting the evidence obtained from that search.  The officers had already begun searching the motel room in defendant's presence, including entering closed containers, while he reviewed and signed the form.  Under those circumstances, the consent form alone is not an intervening circumstance sufficient to purge the taint of that unlawful invasion.  See Santa, 236 F.3d at 678 (finding consent form signed after search complete insufficient to purge taint of illegal arrest).  Likewise, the third causation factor weighs in favor of excluding the evidence at issue.  As discussed supra Part IV.B, the officers' stated purpose in entering Room 210 without a warrant was to seize defendant.

19

Therefore, under the totality of the circumstances the undersigned reports that Mr. Slaughter's consent to the search of Room 210 and his vehicle was the product of an illegal detention.   As discussed above, even assuming his consent was voluntary and uncoerced, it was not sufficiently separated from the taint of the illegal entry and seizure to render the resulting evidence admissible.   Accordingly, the undersigned **RECOMMENDS GRANTING** defendant's request to exclude the evidence obtained from the search of Room 210 and his vehicle as the product of an illegal seizure.

### D.   Identity Evidence And Prior Conviction

Mr. Slaughter cites no authority to support his request to suppress his identity and prior conviction as fruit of the illegal seizure.   (See Def.'s Br. 7 n.5 & 14.) Rather, in INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), the Supreme Court explained in dicta that, "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."   468 U.S. at 1039.  Moreover, the Eleventh Circuit applied that dicta in United States v. Farias-Gonzalez, 556 F.3d 1181 (11th Cir. 2009), permitting the introduction of identity-related evidence obtained via an illegal arrest in a criminal

20

prosecution.  556 F.3d at 1185-90 (holding that "exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution"); <u>see also United States v. Del Toro Gudino</u>, 376 F.3d 997, 1001 (9th Cir. 2004) (holding that "the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity").

In <u>Farias-Gonzalez</u>, the Circuit determined that the social cost of excluding the defendant's identity and criminal history outweighed the deterrence benefit of its exclusion.  556 F.3d at 1186-89 (applying cost-benefit balancing test used by Supreme Court in <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006)).  The Circuit compared the social cost of permitting a defendant to hide who he is–i.e., the undermining of the criminal justice system–with the possible benefits of applying the exclusionary rule to identity-related evidence–i.e., a minimal incentive to reduce Fourth Amendment violations.  <u>Id.</u> at 1186-89.  In that regard, the <u>Farias-Gonzalez</u> court also concluded that the defendant's alien file (including his deportation history) was admissible.  <u>Id.</u> at 1189; <u>see also United States v. Guzman-Bruno</u>, 27 F.3d 420, 422 (9th Cir. 1994) (holding that there is "no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence").

AO 72A
(Rev.8/8
2)

As in <u>Farias-Gonzalez</u>, although Mr. Slaughter's illegal arrest triggers the potential application of the exclusionary rule, it does not require suppression of his identity and any prior convictions (where relevant and otherwise admissible).  As discussed <u>supra</u> Part IV.A, the Government had probable cause to arrest Mr. Slaughter for attempting to entice minors to engage in criminal sexual activity. Although the officers learned his identity via an illegal seizure, that information was freely obtainable without violating the Fourth Amendment.  The officers would have learned defendant's name had they waited for Mr. Slaughter to emerge from Room 210 or obtained a search warrant for the person in Room 210.  Moreover, even if suppressed, the Government may obtain Mr. Slaughter's identity by other means and re-indict him (thereby also learning his criminal history).  Thus, the cost of suppressing Mr. Slaughter's identity and prior conviction is high and is not outweighed by the minimal (if any) deterrence benefit of suppressing it. Accordingly, the undersigned **RECOMMENDS DENYING** defendant's request to suppress his identity and prior conviction.

AO 72A
(Rev.8/8
2)

### E.     Custodial Statement

In addition to the evidence seized from his motel room and vehicle, Mr. Slaughter seeks to suppress as "fruit of the poisonous tree" his custodial statement taken at the Catoosa County Sheriff's Office.  (Def.'s Br. 16.)  However, the Supreme Court rejected a similar argument in New York v. Harris, 495 U.S. 14 (1990), holding that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the [Government's] use of a statement made by the defendant outside of his home, even though the statement is taken after an [illegal] arrest in the home . . . ."  495 U.S. at 21.  The Court therefore turns to Mr. Slaughter's alternative argument to suppress his statement–that his Mirandized confession was coerced and involuntary.  Indeed, even in Harris, the Supreme Court acknowledged that a statement taken during legal custody would be inadmissible if, for example, it was the product of coercion.  Id. at 20.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478.  These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial

AO 72A
(Rev.8/8
2)

which was elicited from a person in custody through interrogation." <u>Endress v.</u> <u>Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989).  A two-part inquiry determines the admissibility of a confession or self-incriminating statement.  Courts making a determination on the validity of a defendant's waiver of his Miranda rights may find such a waiver valid only if the totality of the circumstances show both of the following: (1) an uncoerced choice and (2) an awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran</u> <u>v. Burbine</u>, 475 U.S. 412, 421 (1986).

Defendant does not allege that law enforcement failed properly to advise him of his Miranda rights or that he did not understand those rights.  Rather, Mr. Slaughter alleges that Detective Scroggins coerced him into signing the Miranda form by threatening to make his arrest public and embarrass him in the media if he did not cooperate.  The undersigned has reviewed the videotaped recording of Detective Scroggins's Miranda warning and prior statement to Mr. Slaughter. Detective Scroggins explained to Mr. Slaughter that the officers preferred that defendant's arrest receive no publicity and simply encouraged him to cooperate. "An official who encourages cooperation with the government and who informs the defendant of realistically expected penalties for cooperation and/or non-cooperation

24

does not offer an illegal inducement." United States v. Mendoza-Cecelia, 963 F.2d 1467, 4175 (11th Cir. 1992), abrogated on other grounds by Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994). Here, Detective Scroggins's statement cannot reasonably be considered a threat to publicize Mr. Slaughters's arrest or an indication that defendant would suffer such a "penalty" if he did not cooperate. Rather, it is clear that Detective Scroggins requested defendant's cooperation and did not want the task force's investigation methods publicized. Thus, the undersigned reports that defendant's Miranda waiver was uncoerced.

However, even where the Government has complied with the requirements of Miranda, as in this case, the Court must consider whether the confession or self-incriminating statement was voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). Therefore, the Court also must examine the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics," to determine whether Mr. Slaughter's statement was voluntary. See United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). Factors relevant to that determination include, "the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the

25

length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Id. (internal quotations and citations omitted) (alteration in original).   Additionally, where a Mirandized statement is given subsequent to an illegal arrest, the Court must consider whether it is tainted by the prior illegality. United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986).  As discussed supra Part IV.C, the following factors are relevant to that determination: (1) the temporal proximity of the arrest and the consent to the search, (2) intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. Santa, 236 F.3d at 677.  The Court considers all of the above factors below.

Here, Mr. Slaughter's custodial statement appears voluntary under the totality of the circumstances.   Defendant is a high school graduate and told Detective Scroggins that he is able to read and write well.   (I Tr. 23-24, 26-27; Gov't Ex. 3 (Miranda waiver form).) Detective Scroggins unhandcuffed defendant, administered the Miranda rights, and thoroughly reviewed those rights with him.  Mr. Slaughter further reviewed the Miranda form before signing it.   At that point, Ms. Slaughter had not been detained a lengthy period of time and there is no evidence that he was punished or deprived of anything during the detention.

26

Furthermore, defendant's confession was sufficiently attenuated from the illegal arrest by time and intervening factors, thereby purging the primary taint.  Mr. Slaughter made his statement approximately forty-five minutes after his illegal arrest.  The officers did not question defendant in his motel room and there is no evidence that Mr. Slaughter made any statements there.[12]  Rather, the officers removed Mr. Slaughter to an administrative room in the Catoosa County Sheriff's Office, unhandcuffed him, provided him with his eyeglasses, read and explained his Miranda rights, and allowed him to review the Miranda form (which he signed) before he made the statement at issue.  See Edmondson. 791 F.2d at 1515-16 (finding confession admissible and sufficiently purged of taint where defendant made statement forty-five minutes after illegal arrest, away from scene of arrest, after twice being advised of Miranda rights, and initiated the confession).  Finally, as discussed supra Part IV.A, the officers had probable cause to arrest Mr. Slaughter; thus, he was lawfully in custody when Detective Scroggins questioned him at the

---

[12] In his Reply, defendant argues that his confession must be suppressed because his Miranda waiver was tainted by the knowledge that the officers had recovered incriminating evidence from Room 210. (Def.'s Reply 18-19.) Defendant provides no case law in support of that contention.  For the reasons set forth above, Mr. Slaughter's Miranda waiver was voluntary.  Likewise, his subsequent statement was voluntary and sufficiently attenuated from the illegal search and seizure.

AO 72A
(Rev.8/8
2)

Catoosa County Sheriff's Office.  See Harris, 495 U.S. at 18 (although warrantless arrest in home was illegal, probable cause supported arrest; thus, defendant was lawfully in custody when police immediately transported him to station for questioning).

The undersigned therefore reports that, under the totality of the circumstances, Mr. Slaughter's statement likely resulted not from coercion or an illegal seizure, but from a belief that cooperating with law enforcement was in his best interest.  Because Mr. Slaughter made an uncoerced and knowing waiver of his Miranda rights, followed by a voluntary statement to law enforcement, the undersigned **RECOMMENDS** that the Court **DENY** his Motion to Suppress Statement.

## V.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Motion to Suppress Statement [10] be **DENIED** as defendant's voluntary Mirandized statement is admissible.   Additionally, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Illegally Seized Evidence [11] be **GRANTED IN PART**.  The evidence seized from Mr. Slaughter's motel room and vehicle should be excluded; however, the illegal seizure does not require exclusion of his identity and prior conviction.

28

AO 72A
(Rev.8/8
2)

**SO RECOMMENDED**, this 1st day of March, 2011.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

29

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL ACTION FILE
NO. 4:10-CR-24-HLM-WEJ

CHESTER RAY SLAUGHTER,

Defendant.

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  If no objections are filed, the Non-Final Report and

Recommendation may be adopted as the opinion and order of the District Court, and

any appellate review of factual findings will be limited to a plain error review.

United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation

with objections, if any, to the District Court after expiration of the above time period.


**SO ORDERED**, this 1st day of March, 2011.


_Walter E. Johnson_

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2